ORIGINAL

U.S. DISTRICT COURT FILED FEB 29 2016 S.D. OF N.Y.

Approved: JORDAN ESTES
Assistant United States Attorney

DOC #

Before: THE HONORABLE HENRY PITMAN
United States Magistrate Judge
Southern District of New York

16 MAG 1397

UNITED STATES OF AMERICA

- v. -

GILBERTO CABRERA,
ROBERT HESPETH,
KIAN GOHARI,
a/k/a "Danny,"
SHERI BOWEN,
CALVIN BARRETT, JR.,

Defendants.

**SEALED COMPLAINT**

Violation of
21 U.S.C. § 846

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

ERIN CAHILL, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
(Narcotics Conspiracy)

1. From at least in or about 2014, up to and including in or about October 2015, in the Southern District of New York and elsewhere, GILBERTO CABRERA, ROBERT HESPETH, KIAN GOHARI, a/k/a "Danny," SHERI BOWEN, and CALVIN BARRETT, JR., the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that GILBERTO CABRERA, ROBERT HESPETH, KIAN GOHARI, a/k/a "Danny," SHERI BOWEN, and CALVIN BARRETT, JR., the defendants, and others known and unknown, would and did distribute and possess with intent to

distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance that GILBERTO CABRERA, ROBERT HESPETH, KIAN GOHARI, a/k/a "Danny," SHERI BOWEN, and CALVIN BARRETT, JR., the defendants, conspired to distribute and possess with the intent to distribute was oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in substance and in part, as follows:

4. I have been a Special Agent with the FBI for seven years. During that time, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations and drug records.

5. I have participated in the investigation of this matter, and I am familiar with the information contained in this Complaint based on my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, and my training and experience. Because this Complaint is being submitted for the limited purpose of establishing probable cause to arrest the defendants, I have not included the details of every aspect of the investigation. Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

**The Drug Trafficking Organization**

6. Since 2014, I and other law enforcement officers have been investigating a drug trafficking organization ("DTO") that, among other things, (i) arranges for individuals to visit doctors' offices and receive prescriptions for oxycodone that they do not intend to use, (ii) fills those prescriptions at a particular pharmacy in Brooklyn, New York (the "Pharmacy"), and (iii) distributes those oxycodone pills to purchasers in the New York metropolitan area.

7. The conspiracy was led by two individuals, GILBERTO CABRERA and ROBERT HESPETH, the defendants, neither of whom were medical professionals. CABRERA and HESPETH recruited

co-conspirators - like SHERI BOWEN, the defendant - willing to obtain prescriptions of oxycodone that they do not intend to use. CABRERA and HESPETH then arranged for the co-conspirators to visit doctors' offices in Brooklyn, New York. Frequently, before a co-conspirator visited the doctor, CABRERA or HESPETH would provide the co-conspirator with urine that would test positive for oxycodone, so that the doctor would believe that the co-conspirator was, in fact, taking oxycodone.

8. After a co-conspirator received the oxycodone prescription, GILBERTO CABRERA, the defendant, would arrange for the prescription to be sent to the Pharmacy to be filled or he would take the prescription to the Pharmacy himself. CABRERA gave the prescriptions to a particular pharmacist - KIAN GOHARI, a/k/a "Danny," the defendant - who would fill the co-conspirators' prescriptions for CABRERA.

9. After receiving the oxycodone pills, GILBERTO CABRERA, the defendant, would distribute the pills to individuals in the New York metropolitan area. For example, CALVIN BARRETT, JR., the defendant, frequently purchased distribution-level quantities of oxycodone from CABRERA.

**Title III Interceptions**

10. On August 10, 2015, pursuant to Title III, the Honorable Katherine Polk Failla, United States District Judge, Southern District of New York, signed an Order authorizing the interception and recording of wire and electronic communications occurring over a cellphone used by GILBERTO CABRERA, the defendant, (the "Cabrera Phone"). Interception of wire and electronic communications over the Cabrera Phone began on or about August 11, 2015 and ceased on or about September 9, 2015. On September 28, 2015, pursuant to Title III, the Honorable George B. Daniels, United States District Judge, Southern District of New York, signed an Order authorizing the continued interception and recording of wire and electronic communications occurring over the Cabrera Phone. Interception of wire and electronic communications over the Cabrera Phone began again on or about September 29, 2015 and ceased on or about October 27, 2015 (collectively with August 11, 2015 through September 9, 2015, the "Periods of Interception").

11. I have reviewed wire and electronic communications intercepted during the Periods of Interception. Based on that review, I have learned the following:

a. On or about August 18, 2015, at approximately 12:39 p.m., GILBERTO CABRERA, the defendant, called CALVIN BARRETT, JR., the defendant, on a phone number used by BARRETT (the "Barrett Number").[1] The following conversation took place, in substance and in part[2]:

CB: Yo.

GC: What's good Pepe?

CB: [Unintelligible].

GC: Yeah I'm picking up 90.

CB: Alright I'll meet you at the same spot.

GC: Alright I'm on my way to the church now to pick those up.

CB: Alright hit me when you're on your way there.

GC: Alright I'll call you when I'm on my way over there.

Later on or about August 18, 2015, at approximately 12:59 p.m., CABRERA called BARRETT on the Barrett Number. CABRERA and BARRETT discussed, in sum and substance, directions to where BARRETT was located on 18th Street. Based on my training and experience, and my involvement in this investigation, I believe that CABRERA and BARRETT were arranging to meet so that CABRERA could sell BARRETT 90 oxycodone pills. The reference to "church" refers to the street where the Pharmacy is located.

b. On or about August 19, 2015, CABRERA received a telephone call from a co-conspirator not named herein ("CC-1"). The following conversation took place, in substance and in part:

---

[1] There is no subscriber listed for the Barrett Number. I believe that BARRETT uses the Barrett Number because surveillance has shown that a male identified as BARRETT has met up with CABRERA immediately after calls with the Barrett Number arranging to meet up for a drug sale. See infra ¶¶ 11.1 and 21. In addition, intercepted telephone calls with the Barrett Number reference the 18th Street location where BARRETT and CABRERA were observed meeting on October 9, 2015. See infra ¶¶ 11.a and 21.

[2] All quotations of interceptions are based on preliminary transcriptions prepared by law enforcement.

CC-1: She said god damn she hadn't seen me in a long time and shit and she was gonna drop me from 30 milligrams to 15 three times a day . . . I said why don't you just ahhh you know [unintelligible] another time [unintelligible]. She said naaaah I can't do that. [Unintelligible] 15 milligrams three times a day.

GC: Yeah but why . . . [unintelligible] three times.

CC-1: Huuuh.

GC: That would have been 90. Yeah but what I am saying is why you only telling me you went there because they said they wanted to raise you when you had to go to pain management.

CC-1: I told her I told her [unintelligible] I was going to therapy but it wasn't happening, so I said I tried to come back to you [unintelligible] injections and stuff you know . . . and she said well maybe so but I still ain't seen you in a while so I have to cut your milligrams down [unintelligible].

GC: [Unintelligible].

CC-1: [Unintelligible].

GC: Might as well wait till tomorrow then.

CC-1: Huuuh?

GC: I guess we might as well wait till tomorrow then.

GC: I said we might as well wait till tomorrow then

CC-1: Huuuh?

GC: I said I guess you might as well wait till tomorrow.

CC-1: Yeah yeah. She said ..[unintelligible].

GC: Huuuh?

CC-1: She sent that shit today..that 15 milligram she sent it by [unintelligible] so you better call your man at the

pharmacy and tell him not to bother putting that shit through.

GC: No he won't do it anyway till we get there.

CC-1: Yeah alright man.

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA and CC-1 were discussing that the prescription for CC-1 was only for 15 milligrams of oxycodone. I know from conversations with other law enforcement officers that 15 milligram oxycodone pills do not sell well on the street. I believe the reference to "man at the pharmacy" is a reference to KIAN GOHARI, a/k/a "Danny," the defendant.

c. On or about August 24, 2015, CABRERA received a telephone call from a co-conspirator not named herein ("CC-2"). The following conversation took place, in substance and in part:

GC: Hey, what's good, man?

CC-2: Not bad, not much. . . . How's everything looking?

GC: Uhh - Wednesday and, um, - Friday.

CC-2: Alright. You gonna hold them for me? I want you, if you can, hold them for me, bro.

GC: Hold it for you? Why - it ain't working out?

CC-2: No, no, no - everything's good. I just told my boy, he had asked me for some bread, so I tried to do the right thing - give him whatever he gave me, I'm gonna give him the dollar this time, you know what I mean? I just don't want to go back and forth. I just don't want to cut my man out, you see what I'm saying?

GC: No, no. Chill. Alright. Yeah.

CC-2: Okay - um -

GC: I'll go Wednesday - Wednesday is only gonna be 90, and then, uh, - should be almost 200 about Friday.

CC-2: Alright. Cool, cool. I'll be down there, um - I'll be down there Friday night.

Based on my training and experience, and my involvement in this investigation, I believe that CABRERA and CC-2 were discussing CABRERA's sale of pills, with CABRERA indicating that he has pills to sell. I believe "90" and "200" refer to quantities of pills. I believe CABRERA is discussing how, by the end of the week, CABRERA will have 200 pills to sell.

d. On or about September 8, 2015, CABRERA called ROBERT HESPETH, the defendant, at a phone number used by Hespeth (the "Hespeth Number").[3] The following conversation took place, in substance and in part:

GC: Sheri goes tomorrow, right?

RH: Yes, sir.

GH: You have enough urine for her, right?

RH: I was just about to tell you when you come bring some.

GC: Yeah, I know [unintelligible] . . . Remind me.

RH: Let me check real quick.

GC: Make sure you bring enough. And Joe's going Thursday, right?

RH: Yes.

GC: Because guess who's . . . [unintelligible]

RH: I probably got enough for both of them.

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA and HESPETH were discussing a doctor's appointment for SHERI BOWEN, the defendant, and the urine they intended to provide BOWEN for that doctor's appointment.

---

[3] Based on my discussions with an investigator with the Office of Medicare Inspector General (the "Investigator"), I know that ROBERT HESPETH, the defendant, listed the Hespeth Number on his Medicaid application. In addition, on or about May 1, 2015, the Investigator called the Hespeth Number, and a male answered and identified himself as ROBERT HESPETH. HESPETH confirmed that the Hespeth Number was his telephone number.

e. On or about September 9, 2015, CABRERA received a telephone call from BARRETT, who was using the Barrett Number. The following conversation took place, in substance and in part:

GC: Everything cool?

CB: Yeah yeah.

GC: [Unintelligible] see this going to waste. I want to make sure everything is good. Yeah, I got 80 alright?

CB: Alright bet [unintelligible] that same spot?

GC: Yeah we will meet at the same spot. I should be there in like 10 minutes I guess. I am over here by Church.

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA and BARRETT were discussing the sale of 80 oxycodone pills. The reference to "Church" refers to the street where the Pharmacy is located.

f. On or about October 2, 2015, CABRERA called BOWEN at a phone number used by Bowen (the "Bowen Number").[4] The following conversation took place, in substance and in part:

SB: They not opened today, I wish I had went yesterday.

GC: They ain't open today, that is what I was about to tell you, I spoke to him it is a Jewish Holiday all week. So I finally got him and . . . uh . . . He said if you go today, he will be able to take care of you Sunday.

SB: Okay they are not opened today, the doctor's office is not opened today, so I am going to go Monday.

GC: Okay.

---

[4] I have reviewed telephone records which show that in or about September 2015, the Bowen Number was subscribed in the name of SHERI BOWEN. In addition, I have reviewed Human Resources Administration records for BOWEN, which show that BOWEN provided the Bowen Number as her contact number. On or about February 25, 2016, another law enforcement officer called the Bowen Number and a female answered and identified herself as SHERI BOWEN. BOWEN confirmed that the Bowen Number was her number.

SB: So it didn't matter if I went to the doctor anyway Jewish Holiday, he still wasn't there.

GC: [Unintelligible].

SB: So I am going to go Monday, so I got to get the urine from [unintelligible].

GC: Yeah I just brought fresh urine to [unintelligible].

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA and BOWEN were discussing a doctor's appointment for BOWEN and the urine BOWEN needed to provide to the doctor, so that the doctor would think BOWEN was taking the oxycodone she was prescribed.

g. Later, on or about October 2, 2015, CABRERA called a co-conspirator not named herein ("CC-3"), who was using the Hespeth Number. The following conversation took place, in substance and in part:

CC-3: Hello.

GC: Yeah, what's the verdict?

CC-3: Hah.

GC: What's the verdict?

CC-3: [Unintelligible].

GC: They done?

CC-3: No [unintelligible] she waiting for the doctor to call her, she should be next.

GC: Oh she is next.

CC-3: Yeah she is going to be next.

GC: Alright so I am going to start heading over there then, I am not far.

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA and CC-3 were discussing a

co-conspirator's appointment with a doctor, presumably to receive a prescription. I believe CC-3 was escorting the co-conspirator to her appointment. I believe that CABRERA's reference to "heading over there then" means he was heading to meet the co-conspirator and CC-3 to pick up the co-conspirator's prescription and fill it.

h. On or about October 2, 2015, CABRERA called BARRETT, who was using the Barrett Number. The following conversation took place, in substance and in part:

GC: You still out of town?

CB: No I just waking up and shit, what we got?

GC: Oh you back.

CB: I came back earlier today.

GC: Alright good, so listen. I still got that 90 I had, and I am going to pick up two more 90 now. I waiting for homeboy to finish and I am going to head to the pharmacy. I just wanted to see if you were in town.

CB: Alright bet, that's 3 90s you got?

GC: Right I got 1 so far, I had it when you told me you were out of town. I held that. And now I got one in my hand and I am waiting for the other dude to come out so that I can go cash them out.

Based on my training and experience, and my involvement with the investigation, I believe that CABRERA and BARRETT were discussing a sale of oxycodone. I believe "90" refers to the quantity of oxycodone pills.

i. On or about October 5, 2015, CABRERA called a phone number associated with the Pharmacy (the "Pharmacy Number")[5] and spoke to an unknown male ("UM"). The following conversation took place, in substance and in part:

UM: Pharmacy, how can I help you?

GC: Yeah, can I speak with Danny please?

---

[5] I have reviewed public records, which show that the Pharmacy Number is associated with the Pharmacy.

UM: He's not in today.

GC: He's not coming in at all?

UM: No. Do you want to call back on Wednesday?

GC: Okay.

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA called the Pharmacy to ask if KIAN GOHARI, a/k/a "Danny,"[6] the defendant, was there. Based on other intercepted calls, I know that CABRERA only picked up oxycodone prescriptions from GOHARI.

j. Also on or about October 5, 2015, CABRERA texted a personal telephone number used by GOHARI (the "Gohari Number").[7] That text message stated: "I drove 3 hours you never told me not to come today I told you it was sheri bowen day." Based on my training and experience, and my involvement with this investigation, I believe that the "3 hours" refers to the driving time between CABRERA's house, which is in Pennsylvania, and the Pharmacy in Brooklyn. I believe that CABRERA was complaining that he could not pick up a prescription for BOWEN since GOHARI was not there.

k. In addition, on or about October 5, 2015, CABRERA received a telephone call from a co-conspirator not named herein ("CC-4"). The following conversation took place, in substance and in part:

CC-4: Danny ain't got nothin?

GC: He ain't here.

CC-4: Oh, he ain't here.

GC: Yeah.

---

6 I have reviewed law enforcement databases, and from that review, I know that GOHARI uses the name "Danny."

7 I have spoken to another law enforcement officer, who has spoken to a representative of the Office of Medicare Inspector General, and based on that conversation, I know that GOHARI has provided the Gohari Number as his contact number. In addition, GOHARI is affiliated with the Gohari Number in law enforcement databases.

CC-4: Oh. Are they closed?

GC: No. They open.

CC-4: Oh. They open but he ain't there.

GC: Right.

CC-4: [Unintelligible] You don't fuck with nobody but him.

GC: Yup. [Unintelligible]

CC-4: If I go there would they fill it or you know what I mean?

GC: No. [Unintelligible]. How are you? Everything good?

Based on my training and experience, and my involvement with this investigation, I believe that CC-4 and CABRERA are discussing whether GOHARI is at the Pharmacy and whether CC-4 will be able to fill an oxycodone prescription in GOHARI's absence.

l. On or about October 9, at approximately 10:49 a.m., CABRERA called BARRETT, who was using the Barrett Number. The following conversation took place, in substance and in part:

CB: Ummm yeah.

GC: What's good homie?

CB: Yeah, what up?

GC: You, uhh, in the hood?

CB: Yeah.

GC: I didn't hear you.

CB: I said yeah yeah.

GC: Good nah cause I started driving down here so I wanted to make sure, if not I was gonna turn back around. So I should be in the city in about another hour. I should be over there.

CB: Alright cool [unintelligible].

GC: Alright cool, I've got 200.

CB: Alright.

At approximately 12:27 p.m., CABRERA called Barrett at the Barrett Number and stated, in substance and in part: "I'm here." Based on my training and experience, and my involvement with this investigation, I believe that the two phone calls between CABRERA and BARRETT were to arrange a meeting for the sale of 200 oxycodone pills. I believe that CABRERA references "the city" because he drives from his home in Pennsylvania to conduct drug transactions in New York.

m. On or about October 10, 2015, CABRERA received a telephone call from HESPETH, who was using the Hespeth Number. The following conversation took place, in substance and in part:

RH: She said she can't even keep my script in there, 'til tomorrow.

GC: Who said that?

RH: Some lady. I ain't never seen her. Never, ever seen her.

GC: Well, tell her Danny said, tell her Danny said for you to leave it here.

RH: Yes, sir.

GC: Yo, you don't see that other worker there?

RH: No, it's just her in there.

GC: Tell her.

RH: I ain't never seen this lady before, either. She is a young girl.

GC: Oh, yeah. So [unintelligible] Danny always told me to leave this here. Because he will take care of it on Sunday in the morning . . .

RH: I'm saying, like I don't [unintelligible] she is trying to beef about that shit.

GC: How?

RH: She is trying to talk about this is a big responsibility. [unintelligible] how you get him on the phone. I've been trying to call him all day. [unintelligible] and what not, he always tells me to leave it. Talking about it's a big responsibility. He told her not to.

GC: He told her?

RH: Yeah.

GC: He probably told her not to fill them, but he ain't never said not to leave them. So you ain't asking her to fill it.

RH: I just said, I am asking to leave it. He will fill it in the morning. . . . she is making a big ass deal about it.

GC: Just take it, then, fuck it. I'm going to call [unintelligible] up, it will be like, what the fuck is going on.

RH: Who, Danny?

GC: Yeah.

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA and HESPETH are discussing that HESPETH is attempting to leave prescription(s) at the Pharmacy to be filled, and the pharmacist working at the counter does not want him to leave them there. I believe "Danny" is a reference to GOHARI.

n. Later on or about October 10, 2015, CABRERA called the Gohari Number and left a voicemail. The voicemail stated, in substance and in part:

GC: Yeah, what's going on? Listen. I don't know what the fuck is with these people's attitude here, but you tell me to leave the script here if anything, and you know this employee of yours, I ain't said nothing yet, but. You know, let's talk about [unintelligible] shit you know and I don't appreciate that when I, you know, I am just going

about what you told me to do.

Based on my training and experience, and my involvement with this investigation, I believe that CABRERA is leaving a voice message for GOHARI, expressing his frustration about the Pharmacy employees who will not accept the prescriptions. I believe that "you tell me to leave the script here" and "I am just going about what you told me to do" are references to GOHARI's previous instructions to CABRERA.

o. On or about October 27, 2015, at approximately 4:31 p.m., CABRERA had a telephone call with GOHARI, who was using the Pharmacy Number. The following conversation took place, in substance and in part:

KG: Yeah listen I will not have Benn Darin's "stuff."

GC: Nah I'm gonna bring the, the prescriptions.

KG: I know, I'm not gonna have it.

GC: Why whatcha mean?

KG: When you come I'm . . . uhhh . . .

GC: He he don't get that. He's gonna have his other medicines right?

KG: No, I'm not gonna have anything. I'm not gonna have any medications for him.

GC: You gotta order it?

KG: Nooo. When you come in I'll let you know.

Based on my training and experience, and my involvement with this investigation, I believe GOHARI is telling CABRERA that he will not be able to dispense prescription drugs to CABRERA.

**Investigation of the Pharmacy**

12. I have reviewed Department of Education records and spoken with a representative of the Department of Education. Based on that review and those discussions, I have learned the following:

a. KIAN GOHARI, a/k/a "Danny," the defendant, is the owner and supervising pharmacist at the Pharmacy.

b. On or about October 27, 2015, the Department of Education conducted an inspection of the Pharmacy. During the inspection, GOHARI was unable to produce a copy of the Pharmacy's Bi-annual Control Drug Inventory Report.

13. I have reviewed records maintained by the Office of Medicare Inspector General ("OMIG"). Based on that review and those discussions, I have learned that SHERI BOWEN, the defendant, received prescriptions for 30-milligram oxycodone pills every month in 2015.

14. Based on my review of telephone toll records, I know that SHERI BOWEN, the defendant, frequently calls GILBERTO CABRERA, the defendant, on the days where her prescription is refilled at the Pharmacy.

a. For example, the Bowen Number was in contact with the number associated with the Cabrera Phone ("Cabrera Number") on or about January 22, 2015. Also on or about January 22, 2015, a prescription for oxycodone in BOWEN's name was filled at the Pharmacy.

b. The Bowen Number was in contact with the Cabrera Number on or about March 23, 2015. Also on or about March 23, 2015, a prescription for oxycodone in BOWEN's name was filled at the Pharmacy.

c. Similarly, in April, May, June, July, August, September, and October of 2015, the Bowen Number was in contact with the Cabrera Number on the days that a prescription for oxycodone in BOWEN's name was filled at the Pharmacy.

15. Based on my review of telephone toll records, I know that from January 4, 2015 through June 2, 2015, the Cabrera Number was in contact with the Pharmacy Number over 50 times.

16. Based on my review of prescription records, I know that oxycodone prescriptions for members of the conspiracy have not been filled at the Pharmacy since October 28, 2015.

**Surveillance, Pole Camera, and GPS Monitoring**

17. Throughout this investigation, I and FBI Special Agents and other law enforcement officers have conducted physical surveillance of locations relevant to the investigation. During that surveillance on or about May 29, 2014, we observed, among other

things, the following:

a. ROBERT HESPETH, the defendant, and an individual ("Individual-1") walked towards a doctor's office on Voorhies Avenue (the "Doctor's Office"). HESPETH and Individual-1 entered the Doctor's Office.

b. Individual-1 emerged from the Doctor's Office carrying what appeared to be a prescription.

c. HESPETH and Individual-1 walked to the subway and traveled to a location in Brooklyn.

d. HESPETH and Individual-1 met with GILBERTO CABRERA, the defendant. CABRERA entered into a pharmacy while HESPETH and Individual-1 waited outside.

e. CABRERA exited the pharmacy with a black grocery bag, while talking on his cellular phone.

f. CABRERA entered a van that contained HESPETH, Individual-1, and another individual.

18. I and other law enforcement agents also conducted surveillance on or about May 19, 2015. During that surveillance, I observed, among other things, the following:

a. GILBERTO CABRERA, the defendant, arrived at the location of the Pharmacy in a vehicle with multiple passengers.

b. CABRERA exited the vehicle and entered the Pharmacy.

c. Shortly thereafter, CABRERA exited the Pharmacy, entered his vehicle, and drove off with the passengers.

19. On or about June 14, 2015, law enforcement agents installed a pole camera outside of the Pharmacy (the "Pole Camera").

20. I have reviewed license plate reader data from the New York City Police Department ("NYPD") for a vehicle known to be driven by GILBERTO CABRERA, the defendant, and have also reviewed footage from the Pole Camera. Based on that review, I have learned that on a number of occasions, CABRERA traveled through New York, New York to Brooklyn, New York in connection with his drug trafficking activities. As just a few examples:

a. On or about June 29, 2015, CABRERA drove from his home in Pennsylvania, and traveled through New York, New York, to Brooklyn, New York. Later that day, he visited the Pharmacy.

b. On or about August 28, 2015, CABRERA drove from his home in Pennsylvania, and traveled through New York, New York, to Brooklyn, New York. Later that day, he visited the Pharmacy.

c. On or about September 29, 2015, CABRERA drove from his home in Pennsylvania, and traveled through New York, New York, to Brooklyn, New York. Later that day, he visited the Pharmacy.

d. On or about October 20, 2015, CABRERA drove from his home in Pennsylvania, and traveled through New York, New York, to Brooklyn, New York. Later that day, he visited the Pharmacy.

21. I have spoken with other law enforcement agents who, on or about October 9, 2015, conducted physical surveillance in the vicinity of 349 East 19th Street in Brooklyn, New York. During that surveillance, those law enforcements agents observed:

a. At approximately 12:50 p.m., CALVIN BARRETT, JR., the defendant, exited a building located at 349 East 19th Street (the "Building").[8]

b. BARRETT rode a hoverboard one block away, to East 18th Street.

c. At approximately 1:00 p.m., BARRETT entered a vehicle that contained GILBERTO CABRERA, the defendant.

d. At approximately 1:06 p.m., BARRETT exited the vehicle and left East 18th Street.

---

[8] I have reviewed New York Department of Motor Vehicle records, which show that BARRETT lists an apartment in the Building as the address on his New York State identification card.

WHEREFORE, deponent respectfully requests that GILBERTO CABRERA, ROBERT HESPETH, KIAN GOHARI, a/k/a "Danny," SHERI BOWEN, and CALVIN BARRETT, JR., the defendants, be arrested and imprisoned or bailed, as the case may be.

ERIN CAHILL
Special Agent
Federal Bureau of Investigation

Sworn to before me this
29th day of February, 2016

THE HONORABLE HENRY PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK